UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ROBERT JOHNSON,

                    Plaintiff,

        v.

TOWN OF GREECE, WILLIAM D. REILICH,
MICHELLE MARINI, KIRK MORRIS, and
KEITH SUHR,

              Defendants.

_____

**DECISION AND ORDER**

6:23-CV-06441 EAW

## <u>INTRODUCTION</u>

Plaintiff Robert Johnson ("Plaintiff") is a former employee of the Town of Greece (the "Town"). (Dkt. 13 at ¶ 1). Plaintiff alleges that when defendant William D. Reilich ("Reilich") became the Town Supervisor in 2014, Plaintiff's "official Greece duties changed to include thousands of unpaid hours of forced labor for Greece, Bill Reilich, Michelle Marini ['Marini'], Bill Reilich's side business and personal business and the Monroe County Republican Committee [the 'MCRC'.]" (*Id*.). Plaintiff asserts claims under: the Trafficking Victims Protection Act (the "TVPA"), 18 U.S.C. § 1589; the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968; the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 207(a); 42 U.S.C. § 1983; and various provisions of the New York Labor Law (the "NYLL"). (*Id*. at ¶¶ 145-293).

- 1 -

Plaintiff also asserts claims for unjust enrichment, quantum meruit, and breach of contract. (*Id*. at ¶ 241-69).

The Town, Reilich, Marini, Kirk Morris ("Morris"), and Keith Suhr ("Suhr") (collectively "Defendants") have moved to dismiss the following claims for failure to state a cause of action: the RICO claims; all NYLL claims except retaliation; the unjust enrichment and quantum meruit claims; the § 1983 claim against the Town; and the TVPA claim.  (Dkt. 17-2 at 7).  For the reasons below, Defendants' motion is granted as to Plaintiff's RICO and TVPA claims and denied in all other respects.

## BACKGROUND

### I.   Factual Background

These facts are taken from the amended complaint, the operative pleading.  As is required at this stage of the proceedings, Plaintiff's well-pleaded factual allegations are treated as true.

Reilich is the Town Supervisor.  (Dkt. 13 at ¶ 7).  Marini was the Deputy Town Supervisor until December 2023.  (*Id*. at ¶ 8).[1]  Suhr is the Town's personnel director, a position he obtained in 2022.  (*Id*. at ¶¶ 9, 47).  Morris is the Commissioner of the Town's Department of Public Works.  (*Id*. at ¶ 10).

---

[1]      The amended complaint, which was filed in October 2023, alleges that Marini is the Deputy Town Supervisor.  (Dkt. 13 at ¶ 8).  The Court takes judicial notice that Marini left that position in December 2023 and was hired as the Town's director of constituent services, before retiring in June 2024.  *See* Cayne, K., *Greece official retires after allegations she stole from town for home renovations*, Rochester Democrat & Chronicle (June 27, 2024).

Plaintiff alleges that Reilich, Marini, Morris, Suhr, and non-party Karlee Bolaños were part of an enterprise the purpose of which was to "utilize political power, and in particular Bill Reilich's position as Town Supervisor of Greece and corresponding position in the [MCRC]." (*Id*. at ¶ 14). According to Plaintiff, "[p]oliticians routinely asked Bill Reilich for his support and the support of the [MCRC]." (*Id*. at ¶ 20). Reilich "required some of those politicians to directly pay him cash in exchange for Support" and "would require other politicians to make improvements to his personal property in exchange for Support, including but not limited to the building of decks and installation of insulation." (*Id*. at ¶ 22). In addition, "general contractors were not awarded construction bids in Greece unless they arranged for donations to be made to the election campaign of Bill Reilich," and "general contractors were not awarded construction bids in Greece unless they agreed to deliver envelopes to sub-contractors to be filled with donations to Bill Reilich and/or his campaign." (*Id*. at ¶ 27). And "general and/or sub-contractors were not awarded construction bids in Greece unless they agreed to perform services in the personal residences of" the members of the alleged enterprise. (*Id*. at ¶ 28).

The members of the alleged enterprise "would require Greece employees and appointees to collect petition signatures for [MCRC] politicians," "would require Greece employees and appointees to unload election signs from trucks for [MCRC] politicians," "would require Greece employees and appointees to distribute election signs for [MCRC] politicians," and "would require Greece employees and appointees to stuff envelopes related for [MCRC] politicians' campaign mailings." (*Id*. at ¶¶ 30-33). Buildings owned

- 3 -

by the Town were used by the members of the alleged enterprise to "conduct political activities including, but not limited to, meetings with politicians and preparing envelopes for mass mailings." (*Id*. at ¶ 36).

The members of the alleged enterprise otherwise misused Town resources, including by: repairing Reilich's golf cart; "requiring the repair of designated sidewalks so that Michelle Marini could enjoy walks with her daughter"; demanding that the Greece Police Department charge an individual with a crime because they "believed that the individual would harm Bill Reilich's campaign to be re-elected"; threating a Greece police officer with criminal charges if he did not voluntarily accept a disciplinary penalty; and "threaten[ing] and intimidate[ing] the press and watchdogs by using Greece resources to send cease and desist letters, threaten criminal prosecutions and insert false information into official reports." (*Id*. at ¶¶ 37-41).

The members of the alleged enterprise also "caused Greece's banking relationship to change in exchange for political donations to Bill Reilich," "arranged for and/or allowed favorable property assessments to individuals who were members or supporters of the" alleged enterprise, and "exerted improper influence into Greece's approval/denial of work permits, as well as code violation citations." (*Id*. at ¶¶ 43-45).

Plaintiff was employed by the Town for 36 years. (*Id*. at ¶ 5).  He began as a seasonal automotive mechanic through a high school BOCES program in April 1986, and became a full-time laborer in July 1987.  (*Id*. at ¶¶ 50-51).  He was promoted to a full-time

mechanic in 1987, to senior labor foreman in charge of vehicle maintenance in 2000, and to "management" in 2003.  (*Id*. at ¶ 52).

On January 1, 2006, Plaintiff was appointed the Deputy Commissioner of Public Works.  (*Id*. at ¶ 53).  The terms of his employment were governed by the Town's Managers' Handbook, and included a 35-hour workweek, with a standard workday of seven hours.  (*Id*. at ¶ 55).  Reilich became Town Supervisor in 2014.  (*Id*. at ¶ 56).  That same year, he reappointed Plaintiff as Deputy Commissioner of Public Works.  (*Id*. at ¶ 57).

Reilich owns a building in the Town of Sweden, New York commonly referred to as "Hot Rod Ranch" or the "Ranch."  (*Id*. at ¶ 63).  Reilich would buy "used vehicles including cars, recreational vehicles, motor homes and dirt bikes," and arrange for them to be brought to the Ranch, where they would be "worked on, repaired, refurbished and prepared for resale."  (*Id*. at ¶ 64).  Reilich would then sell the vehicles for a profit.  (*Id*.).

From 2014 until Plaintiff's retirement, Reilich required Plaintiff "to inspect, transport, work on, repair, and refurbish the vehicles he resold in his side business" and to "directly respond to inquiries and questions from the individuals who purchased vehicles from" Reilich.  (*Id*. at ¶ 65).  During 2014, Plaintiff "would report to work at the Ranch on Saturdays and work from 8:30 a.m. to 4:30 p.m., with a one-hour lunch break."  (*Id*. at ¶ 69).  Reilich would give Plaintiff "personal checks in nominal amounts purportedly representing payments for his efforts," but did not provide him with a wage statement that accurately reflected his actual hours.  (*Id*. at ¶¶ 71-72).  Plaintiff was not paid the statutorily required minimum wage, and was not paid "an overtime wage for the hours he was required

to work at the Ranch in addition to the hours prescribed by [the Town]." (*Id*. at ¶ 72).  He also "did not accrue the benefits to which he was entitled at [the Town] while he worked at the Ranch, including PTO time." (*Id*.).

In 2015, Plaintiff "worked seven hours a day at [the Town] Monday thru Friday.  On Saturday and at Bill Reilich's direction, [Plaintiff] worked seven hours a day at the Ranch between the hours of 8:30 a.m. and 5:30 p.m." (*Id*. at ¶ 73).  If Plaintiff could not work on a particular Saturday, he had to make up the missed time on a Sunday.  (*Id*. at ¶ 74).  Reilich also required Plaintiff to "perform services on weekday evenings, including, but not limited to, picking up and delivering items to Bill Reilich or the Ranch."  (*Id*. at ¶ 75).  Plaintiff again was not provided with accurate wage statements, paid minimum wage, paid overtime, or credited for the accrual of benefits.  (*Id*. at ¶ 77).

In 2016, Plaintiff told Reilich that he could not work at the Ranch on Saturdays because of family obligations.  (*Id*. at ¶ 78).  Reilich told Plaintiff he would need to work at the Ranch on Fridays.  (*Id*.).  Reilich "devised a scheme" by which Plaintiff would "forfeit seven hours of his Greece PTO time on Fridays" and instead work on the Ranch.  (*Id*. at ¶ 79).  "During most of 2016 through 2019, [Plaintiff] would work seven hours at the Ranch on Fridays at Bill Reilich's direction and with his approval, seven hours would be deducted from [Plaintiff's] PTO bank."  (*Id*. at ¶ 80).  Also during these years, Plaintiff "routinely worked at the Ranch at Bill Reilich's demand including weekdays, weekends and all nights of the week."  (*Id*. at ¶ 81).  "During these years, [Plaintiff] routinely worked in excess of forty hours a week."  (*Id*. at ¶ 83).  Plaintiff continued to not be provided with

accurate wage statements, paid minimum wage, paid overtime, or credited for the accrual of benefits.  (*Id*. at ¶ 85).

In 2020, the Town instituted modified work schedules in response to the COVID-19 pandemic.  (*Id*. at ¶ 86).  "As a result of the modified schedules, Bill Reilich required [Plaintiff] to work additional hours at the Ranch."  (*Id*.).  Plaintiff continued to not be provided with accurate wage statements, paid minimum wage, paid overtime, or credited for the accrual of benefits.  (*Id*. at ¶ 90).

From 2015 through 2021, Reilich and Marini required Plaintiff "to perform countless other services for no compensation[.]"  (*Id*. at ¶ 92).  These additional services included, but were not limited to:

> (1) maintenance and improvements for the personal residences of Bill Reilich and Michelle Marini, (2) services for Bill Reilich's election campaign, including inducing his department's employees to distribute election signs, (3) tasks for the Monroe County Republican party and the candidates it supported, including stuffing envelopes, constructing signs and collecting petition signatures, (5) maintaining the personal driveway of Bill Reilich, (6) "confidentially" removing Greece property to Michelle Marini's garage, (7) making wood centerpieces for a wedding that Michelle Marini was involved in, and (8) installing "ring" camera equipment in Michelle Marini's home.

(*Id*.).[2]

In the summer of 2020, Suhr—who at that time was "an Assistant Director/Librarian III at the Greece Public Library"—asked Plaintiff why he was never in his office on Fridays.  (*Id*. at ¶ 102).  Plaintiff told Suhr that he had to work for Reilich at the Ranch on Fridays.  (*Id*. at ¶ 103).  Later that year, Plaintiff asked Morris, his direct supervisor, "to

---

[2]      In the original, this list does not have an item numbered (4).  (*See* Dkt. 13 at ¶ 92).

intervene with Bill Reilich and Michelle Marini, stop the unlawful labor practices and protect his job." (*Id*. at ¶ 104). Morris told Plaintiff that he should "consider himself lucky" to be in Reilich's "inner circle." (*Id*. at ¶ 105).

Reilich and/or Marini learned about these conversations. (*Id*. at ¶ 106). On December 4, 2020, Reilich was at home recovering from surgery. (*Id*. at ¶ 107). Plaintiff was required to help Reilich with his recovery and to do other work around Reilich's home. (*Id*.). Reilich told Plaintiff that Morris and Marini wanted to "get rid of" Plaintiff. (*Id*.). Reilich told Plaintiff that he "wasn't going anywhere" because Reilich wanted him to stay. (*Id*. at ¶ 109).

On December 7, 2020, Morris "called a meeting of approximately fifteen Greece employees and advised them that [Plaintiff] had been 'reassigned' and stripped of many of his supervisory duties." (*Id*. at ¶ 111). When Plaintiff asked Morris why, Morris told him that Marini "wanted [Plaintiff] to feel the pinch." (*Id*. at ¶ 112). Reilich and Marini also refused to give Plaintiff a pay raise that Reilich had previously promised him. (*Id*. at ¶ 115).

"Shortly after these events, [Plaintiff] sought out Greece's labor attorney Karlee Bolaños to discuss the situation." (*Id*. at ¶ 117). Plaintiff "reported the adverse employment actions and how it was impacting his physical and mental health." (*Id*.). "Ms. Bolaños, in turn, responded 'aren't you still working on Bill's cars at the Ranch?'" (*Id*.).

In 2021, Plaintiff's "vacation/PTO bank was low." (*Id*. at ¶ 121). Plaintiff told Reilich that he was running out of PTO time, and Reilich responded, "you know, Michelle (Marini) doesn't care if you put your time here (at the Ranch) in at Greece." (*Id*. at ¶ 122).

- 8 -

Reilich alternatively "offered to create opportunities for [Plaintiff] to bank additional vacation/PTO time." (*Id.* at ¶ 123).

In a meeting in Marini's office in February 2022, Marini told Plaintiff, "if you are working for Bill (Reilich), then you are working for the town (Greece)." (*Id.* at ¶ 124). Marini "directed [Plaintiff] to submit the hours that [Plaintiff] spent at the Ranch and on Bill Reilich's other personal matters as time he was working for Greece." (*Id.*). Reilich told Plaintiff to follow this instruction by Marini. (*Id.* at ¶ 125).

On April 13, 2022, Plaintiff met with Reilich at Reilich's request at a restaurant. (*Id.* at ¶ 126). Six months before this meeting, the Town's police chief had been in a serious motor vehicle crash, and Plaintiff had been with Reilich at the Ranch while Reilich, Marini, and others participated in phone calls related to the matter. (*Id.* at ¶ 127). At the April 13th lunch meeting, Reilich told Plaintiff that the Monroe County District Attorney's office was investigating those events and would be interviewing Plaintiff. (*Id.*). Reilich expressed concern that the District Attorney's office would discover Plaintiff's "forced labor and the schemes devised by Bill Reilich and Michelle Marini to conceal it," and instructed Plaintiff to lie if asked about his work at the Ranch. (*Id.* at ¶¶ 128-29). Plaintiff "feared for his job, health, pension benefits and his freedom," and retired on May 28, 2022. (*Id.* at ¶ 33). Plaintiff "would have continued to serve Greece residents for several more years but for the severe mental anguish these events caused him." (*Id.*).

Under the Town's policies and based on his title and length of service, Plaintiff was "entitled to the benefit of retiree lifetime health insurance." (*Id.* at ¶ 134). Plaintiff tried

to enroll in said insurance before he retired, and the "Greece Personnel Director" told him he met all eligibility requirements and would be enrolled during the next open enrollment. (*Id*. at ¶ 136). After his retirement, Plaintiff stopped performing work at the Ranch, stopped maintaining Reilich's home and driveway, stopped delivering items to Reilich's and Marini's homes, and stopped working MCRC candidates' campaigns. (*Id*. at ¶¶ 137-38).

"When it came time to enroll" in health insurance, Plaintiff contacted Suhr, who had become the new personnel director, and asked for his enrollment package. (*Id*. at ¶ 139). Suhr told Plaintiff that circumstances had changed, and that Plaintiff was no longer eligible for the retiree lifetime health insurance benefit. (*Id*.).

Plaintiff assumed that Suhr, who had "worked in the library before his recent promotion to Greece's Personnel Director," was mistaken. (*Id*. at ¶ 140). Plaintiff went to Reilich's office and told Reilich that Suhr would not allow him to enroll. (*Id*. at ¶ 141). "Reilich responded, 'well Bobby, I haven't seen you at the Ranch since you retired.'" (*Id*.). Suhr told Plaintiff he would never see a denial in writing. (*Id*. at ¶ 144).

## II.    **Procedural Background**

Plaintiff commenced this action on August 4, 2023. (Dkt. 1). Defendants moved to dismiss the original complaint (Dkt. 8), and Plaintiff filed the amended complaint, as well as the RICO Case Statement required by Local Rule of Civil Procedure 9, on October 18, 2023. (Dkt. 13; Dkt. 14). In light of the filing of the amended complaint, the Court denied the motion to dismiss the original complaint as moot. (Dkt. 15).

Defendants then filed the instant motion to dismiss the amended complaint in part.

- 10 -

(Dkt. 17).  Plaintiff opposed the motion (Dkt. 19), and Defendants completed the briefing by filing a reply (Dkt. 20).

## DISCUSSION

### I.   Legal Standard

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (alteration in original) (internal quotations and citations omitted).  "To state a plausible claim, the

- 11 -

complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (alteration in original) (quoting *Twombly*, 550 U.S. at 555).

## II.   Plaintiff's Claims

The amended complaint contains 17 claims.  Defendants seek dismissal of: the RICO claims (the first and second claims); all the NYLL claims except retaliation (the sixth, seventh, eighth, ninth, eleventh, and twelfth claims); the unjust enrichment and quantum meruit claims (the thirteenth and fourteenth claims); the § 1983 claim as to the Town (the sixteenth claim); and the TVPA claim (the seventeenth claim).  Defendants have not sought dismissal of the FLSA claims (the third, fourth, and fifth claims), the NYLL retaliation claim (the tenth claim), the breach of contract claim (the fifteenth claim), or the § 1983 claim as to Reilich and Suhr.  The Court considers Defendants' arguments below.

### A.   RICO Claims

Plaintiff asserts a substantive RICO claim pursuant to 18 U.S.C. § 1962(c) and a claim for RICO conspiracy pursuant to 18 U.S.C. § 1962(d).  (Dkt. 13 at ¶¶ 145-69).  "The RICO statute makes it unlawful 'for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'" *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (alteration omitted and quoting 18 U.S.C. § 1962(c)).  "To establish a civil RICO claim, a plaintiff must allege (1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity, as well as injury to

business or property as a result of the RICO violation." *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (quotation omitted).  The alleged pattern of racketeering "must consist of two or more predicate acts of racketeering."  *Id.* (citing 18 U.S.C. § 1961(5)).

Defendants argue that Plaintiff has not adequately alleged either the existence of an enterprise or a pattern of racketeering activity.  For the reasons below, the Court agrees that Plaintiff has not plausibly alleged a pattern of racketeering activity, and that his RICO claims must be dismissed.

### 1.     Failure to Allege a Violation of the TVPA

"A pattern of racketeering" is "a series of related predicates that together demonstrate the existence or threat of continued criminal activity."  *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 330 (2016).  "To establish a pattern, a plaintiff must identify at least two predicate acts and show that (1) the acts are related both to each other (horizontal relatedness) and to the enterprise (vertical relatedness) and (2) the conduct continued over a substantial period of time."  *Halvorssen v. Simpson*, 807 F. App'x 26, 29 (2d Cir. 2020).

The RICO statute enumerates what can constitute a predicate act.  *See* 18 U.S.C. § 1961(1).  Plaintiff has identified two alleged predicate acts in this case: forced labor in violation of 18 U.S.C. § 1589 (the TVPA) and witness tampering in violation of 18 U.S.C. § 1512.  (*See* Dkt. 14 at 3).  But Plaintiff has not plausibly alleged a violation of the TVPA.

To reach this conclusion, the Court has carefully considered the elements of a claim under the TVPA.  This statute provides:

- 13 -

(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means –

(1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

(2) by means of serious harm or threats of serious harm to that person or another person;

(3) by means of the abuse or threatened abuse of law or legal process; or

(4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint,

shall be punished as provided under subsection (d).

18 U.S.C. § 1589(a).  An individual who is a victim of a violation of § 1589(a) "may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees."  18 U.S.C. § 1595(a).

"[T]he fundamental purpose of § 1589 is to reach cases of servitude achieved through nonviolent coercion—namely serious harm, the threat of serious harm, or the abuse or threatened abuse of legal process."  *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F. Supp. 3d 430, 439 (E.D.N.Y. 2017).  "The threat of financial harm constitutes serious harm within the meaning of the TVPA."  *Id*. at 438; *see* 18 U.S.C. § 1589(c)(2) ("[t]he term 'serious harm' means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the

- 14 -

surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm").

Plaintiff's theory is that Reilich, Marini, Morris, and Suhr violated the TVPA because they "engaged in a scheme intended to cause Plaintiff to believe that, if he did not perform free labor for the [alleged] enterprise, he would suffer serious financial harm in that he would lose his job and position with the Town of Greece, as well as his salary and benefits."  (Dkt. 14 at 5; *see also* Dkt. 13 at ¶ 152 (alleging that Reilich, Marini, Morris, and Suhr required Plaintiff "to engage in forced labor in violation of 18 U.S.C. § 1589 by means of a scheme or plan or pattern intended to cause him to believe that he would suffer serious harm, including but not limited to termination from his position with Greece if he did not perform such labor or services")).

"Financial harm [for purposes of the TVPA] has been construed to include an improper or illicit nature to the threats, meaning that it is more than what an employee would ordinarily face when threatened with termination."  *Treminio v. Crowley Mar. Corp.*, No. 3:22-CV-00174-CRK-PDB, 2023 WL 8627761, at *13 (M.D. Fla. Dec. 13, 2023); *see, e.g.*, *Roman v. Tyco Simplex Grinnell*, 732 F. App'x 813, 817 (11th Cir. 2018) ("Although Roman argues that the threat of termination qualified as a serious harm . . ., he does not explain how the potential financial harm he might have suffered would be any more serious than the financial harm any employee encounters when faced with termination."); *Treminio v. Crowley Mar. Corp.*, 649 F. Supp. 3d 1223, 1234 (M.D. Fla.

2023) ("[A] run-of-the-mill threat of termination is not a threat of serious harm[.]"); *Dale Carmen v. Health Carousel, LLC*, No. 1:20-CV-313, 2021 WL 2476882, at *6 (S.D. Ohio June 17, 2021) ("[I]t may well be that the threat of losing one's paycheck is 'sufficiently serious' to 'compel a reasonable person' to keep working a job that she does not like.  *See* 18 U.S.C. § 1589(c)(2).  But no one would suggest—or at least no one should suggest— that an employer violates the TVPA simply by refusing to continue paying employees who have quit.  Rather, to constitute 'financial harm' under the TVPA, the threatened harm must be in some way improper or illicit.").

Plaintiff's allegation that he would have lost his job at the Town had he refused to comply with Reilich's and Marini's demands that he perform additional services for them is accordingly insufficient to constitute serious harm for purposes of the TVPA.  A holding to the contrary would improperly broaden the TVPA to potentially encompass every situation in which an employee stays in a job he no longer wishes to perform because he does not want to lose his paycheck.

And while Plaintiff argues he has also alleged that "Bill Reilich and the rest of the Enterprise . . . could and would use their influence to prevent him from finding comparable employment elsewhere" (*see* Dkt. 19 at 13), that allegation is not plausibly alleged. Plaintiff alleges in broad terms that he was "aware that Bill Reilich and other members of the Enterprise used their influence with other municipalities to ensure that employees who left Greece would not be employed by those municipalities."  (Dkt. 13 at ¶ 62).  Plaintiff does not allege that any of the individual defendants ever directly or indirectly leveled a

threat of this nature against him, nor has he identified a single example of an individual against whom such action was taken.  And Plaintiff has not identified any other serious harm to which he was potentially subject if he had refused to perform the labor demanded by Reilich and Marini.  He has accordingly not plausibly alleged a violation of the TVPA.

Plaintiff's failure to plausibly allege two predicate acts is fatal to his substantive RICO claim.  *See Lynch v. Amoruso*, 232 F. Supp. 3d 460, 467 (S.D.N.Y. 2017) ("Because Plaintiffs plausibly allege only one predicate act, their RICO claim fails as a matter of law.").

### 2.   Failure to Allege Continuity

Plaintiff has also failed to plausibly allege a pattern of racketeering because he has not plausibly alleged continuity.  "Continuity can be closed-ended or open-ended." *Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017).  In this case, Plaintiff specifically claims to have alleged a closed-ended pattern of racketeering.  (*See* Dkt. 14 at 6).

"[C]losed-ended continuity is primarily a temporal concept, and it requires that the predicate crimes extend over a substantial period of time."  *Reich*, 858 F.3d at 60 (quotations and citations omitted).  The Second Circuit "generally requires that the crimes extend over at least two years."  *Id*.; *see also Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008) ("Although we have not viewed two years as a bright-line requirement, it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity, particularly where . . . the activities alleged involved only a handful of participants and do not involve a complex, multi-faceted conspiracy."

(quotations omitted)).   "The Court considers only properly pleaded predicate acts in determining the duration of the alleged racketeering activity."  *Red Rock Sourcing LLC v. JGX LLC*, No. 21 CIV. 1054 (JPC), 2024 WL 1243325, at *18 (S.D.N.Y. Mar. 22, 2024); *see also Satinwood*, 385 F.3d at 178 (finding that because "the alleged predicate acts at the temporal extremes of the pattern" were not sufficiently pled, the plaintiff had failed "to allege the requisite continuity to sustain a RICO claim.").

Even assuming for the sake of argument that Plaintiff's fear of termination could serve as "serious harm" for purposes of the TVPA, the Court finds that Plaintiff has not plausibly alleged a violation of 18 U.S.C. § 1589 beginning before December 2020 or continuing after May 28, 2022.  And the alleged violation of 18 U.S.C. § 1512 occurred in April 2022.  Accordingly, at most the alleged predicate acts span a period of significantly less than two years.  There is also no basis to conclude that this is the rare case in which the continuity requirement can be satisfied by a lesser time period.

As discussed above, Plaintiff's theory is that Reilich, Marini, Morris, and Suhr violated the TVPA because they "engaged in a scheme intended to cause Plaintiff to believe that, if he did not perform free labor for the [alleged] enterprise, he would suffer serious financial harm in that he would lose his job and position with the Town of Greece, as well as his salary and benefits."  (Dkt. 14 at 5).  But even if such a scheme existed, Plaintiff has not plausibly alleged that it predated December 2020.

In his amended complaint, Plaintiff identifies the following as "statements made and actions taken by members of the Enterprise" that were "intended to cause [Plaintiff] to

believe that he would suffer serious financial harm if he did not provide free labor to the Enterprise":  (1) "Bill Reilich and Michelle Marini's regular statement, 'if they can't do anything for us, we don't need them'"; (2) "Bill Reilich's communications implying that the work was mandatory, such as, after [Plaintiff] informed Bill Reilich that he could not make it to the Ranch on a Friday, Bill Reilich's response via text message, 'see you Saturday 8:30'"; (3) Reilich's statement to Plaintiff that Marini and Morris wanted him fired but Reilich wanted him to stay; (4) Morris' removal of Plaintiff's supervisory duties after Plaintiff complained about being required to work at the Ranch, and accompanying statement that Marini wanted Plaintiff to "feel the pinch"; (5) Reilich, Morris, and Marini refusing to give Plaintiff a promised pay raise after he complained about being required to work at the Ranch; and (6) Bolaños asking Plaintiff "aren't you still working on Bill's cars at the Ranch?" after Plaintiff complained of the adverse employment actions taken by Reilich, Marini, and Morris.  (Dkt. 13 at ¶ 153).

General statements by Reilich and Marini that "if they can't do anything for us, we don't need them" are not enough to support the conclusion that Reilich, Marini, Morris, and Suhr participated in a scheme to extract forced labor from Plaintiff.  Plaintiff expressly alleges in his amended complaint that this was a "mantra" by Reilich and Marini, that they applied "[w]hen talking about Greece residents, Greece employees, Greece vendors, or other politicians[.]"  (Dkt. 13 at ¶ 59).  "Subsection (a)(4) of § 1589 contains a . . . scienter requirement, requiring a showing that the defendant knowingly used a scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such

labor or services, that person or another person would suffer serious harm or physical restraint." *Baldia v. RN Express Staffing Registry LLC*, 633 F. Supp. 3d 693, 710 (S.D.N.Y. 2022) (quotations and alterations omitted). This scienter requirement requires a plaintiff to plead facts plausibly supporting the inference that the defendants intended him to believe he would suffer serious harm if he did not provide them with labor. *Id*. These general statements by Reilich and Marini, which are not alleged to have been directed at Plaintiff or made in the context of discussing his employment, are insufficient to support such an inference.

The rest of the identified statements and actions purportedly satisfying the scienter requirement all occurred in or after December 2020. (*See* Dkt. 13 at ¶¶ 89 (text message stating 'see you Saturday 8:30' occurred on February 24, 2021), 107 (Reilich told Plaintiff that Morris and Marini wanted him fired on December 4, 2020), 111 (Morris stripped Plaintiff of his supervisory duties because Marini wanted Plaintiff to "feel the pinch" on December 7, 2020), 115 (Plaintiff was refused his promised pay raise at an unspecified time after the events of December 7, 2020), 117 (Plaintiff's conversation with Bolaños occurred "shortly after" December 7, 2020)). Accordingly, at best, the plausibly alleged predicate acts underlying Plaintiff's substantive RICO claim lasted no longer than December 2020 to May 2022.

In his opposition to the motion to dismiss, Plaintiff argues that "the Amended Complaint must be read as a whole," and that he has alleged a scheme "beginning in 2014 when Bill Reilich began demanding free labor from Plaintiff and warning him 'If they can't

do anything for us, we don't need them,' continuing into 2015 when Bill Reilich would require Plaintiff to 'make up time' at the Ranch on Sunday if he could not work Saturday; and in 2016 forcing [Plaintiff] to work at the Ranch on Fridays when he claimed he could no longer come to the Ranch Saturdays."  (Dkt. 19 at 10-11 (internal citations omitted)). The Court has already addressed the "if they can't do anything for us, we don't need them" comments.  Plaintiff's other allegations from before December 2020 are simply that Reilich asked him to work at the Ranch and rescheduled him when he stated he was unavailable. Indeed, Plaintiff's own allegation is his work at the Ranch began with a request—not a demand—from Reilich.  (*See* Dkt. 13 at ¶ 68  ("In 2014, Bill Reilich asked [Plaintiff] to perform services at the Ranch including repairing vehicles he resold and servicing Bill Reilich's family vehicles.")).

In sum, Plaintiff has at best plausibly alleged that the predicate acts here spanned from December 2020 to May 2022, a period of roughly one year and six months.  Plaintiff has not argued that this is the rare case in which continuity can be established based on predicate acts spanning less than two years, nor could he successfully do so—this is a case where "the activities alleged involved only a handful of participants and do not involve a complex, multi-faceted conspiracy."  *Spool*, 520 F.3d at 184 (alteration and quotations omitted, and finding continuity not plausibly alleged because the "sixteen-month period of time [was] insufficient to establish closed-ended continuity—particularly in the absence of separate schemes or large numbers of participants and victims").  Plaintiff's substantive RICO claim must be dismissed.

### 3.     Failure to Plead RICO Conspiracy

Plaintiff's RICO conspiracy claim is based on the same facts as his substantive RICO claim.  (*See* Dkt. 13 at ¶¶ 160-69).  While the failure of a substantive RICO claim is not necessarily fatal to a RICO conspiracy claim in every case, it is here, for the reasons that follow.

"Although a conspirator charged with racketeering conspiracy need not commit or even agree to commit the predicate acts, he 'must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive RICO offense.'"  *United States v. Cain*, 671 F.3d 271, 291 (2d Cir. 2012) (alteration omitted and quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)).  "To establish a substantive RICO violation, a plaintiff must show a 'pattern of racketeering activity,' 18 U.S.C. § 1962(a)-(c), and to establish a RICO conspiracy, a plaintiff must show a conspiracy to commit a substantive RICO violation, *id*. § 1962(d)."  *Spool*, 520 F.3d at 183.  Where the conduct to which the defendants allegedly agreed does not rise to the level of a pattern of racketeering activity, a RICO conspiracy claim will fail.  *See Spiteri v. Russo*, No. 12-CV-2780 MKB RLM, 2013 WL 4806960, at *54 (E.D.N.Y. Sept. 7, 2013) ("A RICO conspiracy requires evidence that a defendant participated in the enterprise through a pattern of racketeering activity, or agreed to do so." (quotation and alteration omitted)), *aff'd sub nom. Spiteri v. Camacho*, 622 F. App'x 9 (2d Cir. 2015).

The Court has concluded that the conduct in which Defendants are alleged to have engaged does not constitute a pattern of racketeering.  Plaintiff has not alleged that there

were additional predicate acts that the alleged RICO participants agreed to commit but that were not ultimately brought to fruition.  Under these circumstances, Plaintiff's RICO conspiracy claim must fail for the same reasons as his substantive RICO claim.  *See, e.g., Halvorssen v. Simpson*, No. 2:18-CV-2683 ENVRLM, 2019 WL 4023561, at *7 (E.D.N.Y. Aug. 26, 2019) ("Having failed to allege a pattern of racketeering activity, Halvorssen cannot establish a substantive RICO violation.  Consequently, his conspiracy claim must be dismissed."), *aff'd*, 807 F. App'x 26 (2d Cir. 2020); *Curtis & Assocs., P.C. v. L. Offs. of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 179 (E.D.N.Y. 2010) (dismissing RICO conspiracy claim where alleged conduct did not constitute at least two predicate acts), *aff'd*, 443 F. App'x 582 (2d Cir. 2011).  The Court therefore grants Defendants' motion to dismiss as to both the substantive RICO claim (the first claim) and the RICO conspiracy claim (the second claim).

### B.   NYLL Claims

Defendants seek dismissal of Plaintiff's sixth, seventh, eighth, ninth, eleventh, and twelfth claims on the basis that Plaintiff has not plausibly alleged that Reilich or Marini was his "employer" under the NYLL.[3]  (*See* Dkt. 17-2 at 19-20).  "[T]he New York Court of Appeals has not yet answered the question of whether the test for 'employer' status is the same under the FLSA and the NYLL[.]"  *Soto v. Crismeli Deli Grocery Inc.*, No. 19-CV-10053 (VSB) (BCM), 2024 WL 3730115, at *5 (S.D.N.Y. June 28, 2024) (citation

---

[3]    The sixth, seventh, ninth, eleventh, and twelfth claims are asserted against both Reilich and Marini.  The eighth claim is asserted against only Reilich.

omitted), *adopted*, 2024 WL 3730300 (S.D.N.Y. Aug. 8, 2024).   But there is "general support for giving [the] FLSA and the New York Labor Law consistent interpretations[.]" *Id.* (citation omitted).   Absent any authority to the contrary, the Court will assume that the same test for employer status applies under the NYLL as under the FLSA.   Under the FLSA, courts look to the "economic reality" of the relationship, considering four non-exclusive factors: "whether the alleged employer (1) had the power to hire and fire the employee[], (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."   *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013).   The economic reality test is "a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances."   *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008).

Defendants' argument that Reilich was not Plaintiff's employer lacks merit. Defendants contend that Plaintiff has alleged that Reilich "asked Plaintiff to perform various tasks related to the repair of cars, lawn maintenance, or other various assistance," but not that "Reilich supervised and controlled Plaintiff's work schedule in the performance of these tasks, that there was any agreed upon rate of pay for that work, or that Reilich maintained employment records regarding the tasks Plaintiff performed for him and/or his family."   (Dkt. 17-2 at 21).   This is a mischaracterization of Plaintiff's allegations, which are set forth in detail above.   Plaintiff has alleged that he regularly performed work for Reilich at the Ranch, and that Reilich controlled and supervised his

schedule and conditions of employment, as well as his rate of pay.  At this stage of the proceedings, this is more than adequate to support the conclusion that Reilich was Plaintiff's employer for purposes of the NYLL.

The argument as to Marini is a much closer one.  But the Court finds that Plaintiff has alleged enough to allow his claims to survive a motion to dismiss.  Plaintiff claims that between 2015 and 2021, he performed "maintenance and improvements" on Marini's personal residence, along with other personal services for Marini.  (Dkt. ¶ 13 at ¶ 92).  Plaintiff alleges that Marini had the power to dictate his hours and terms of employment with respect to these services, as well as to hire and fire him.  (*Id*. at ¶ 206).  Drawing all inferences in Plaintiff's favor, as it must at this stage of the proceedings, the Court finds these allegations sufficient to allow the NYLL claims to proceed.

### C.    Unjust Enrichment and Quantum Meruit Claims

Defendants seek dismissal of Plaintiff's unjust enrichment and quantum meruit claims on the basis that such claims cannot survive where there is a valid and enforceable contract.  (Dkt. 17-2 at 21-22).  This argument is unpersuasive.  Where "there is a bona fide dispute as to the existence of a contract <u>or whether the scope of an existing contract</u> <u>covers the disagreement between the parties</u>, a party will not be required to elect his or her remedies and may proceed on both quasi contract and breach of contract theories." *Pauwels v. Deloitte LLP*, 83 F.4th 171, 188 (2d Cir. 2023) (emphasis added and quotation omitted).  Plaintiff alleges that the work he performed for Reilich and Marini was outside the scope of his contractual relationship with the Town.  (*See, e.g.*, Dkt. 13 at ¶ 257 ("Bill

Reilich and Michelle Marini knowingly required and accepted [Plaintiff's] services performed outside of his scope of employment for Greece.")).  Under these circumstances, the existence of Plaintiff's contract with the Town does not bar his pursuit of quasi-contract claims.

In their reply, Defendants identify several other alleged defects in the unjust enrichment and quantum meruit claims.  (*See* Dkt. 20 at 9).  Whatever the merits of these arguments, they were raised for the first time in reply, and the Court declines to consider them.  *See Ruggiero v. Warner-Lambert Co*., 424 F.3d 249, 252 (2d Cir. 2005).

### D.     Section 1983 Claim

Plaintiff asserts a claim against the Town, Reilich, and Suhr pursuant to 42 U.S.C. § 1983, which provides a federal cause of action against persons who, under color of state authority, caused the deprivation of any rights, privilege, or immunities secured by the Constitution and laws of the United States.  Plaintiff alleges that these defendants deprived him of his right to due process when they wrongfully denied him the ability to enroll in lifetime retiree health insurance.  (*See* Dkt. 13 at ¶¶ 27-82).

Defendants seek dismissal of this claim as to the Town, arguing that Plaintiff has not plausibly alleged municipal liability under *Monell v. Dep't of Soc. Servs*., 436 U.S. 658 (1978).  (*See* Dkt. 17-2 at 23-24).  "*Monell* reasoned that § 1983 rejects the imposition of vicarious liability on a municipality for the torts of its employees as incompatible with § 1983's causation requirement."  *Reynolds v. Giuliani*, 506 F.3d 183, 190 (2d Cir. 2007). A municipality "can therefore only be held liable if its policy or custom, whether made by

its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 128 (2d Cir. 2004) (quotation omitted).

In opposition to Defendants' motion to dismiss, Plaintiff argues that he has sufficiently alleged municipal liability because: (1) "The Amended Complaint alleges that Defendants routinely leveraged the retiree health benefit in connection with securing employee and former employee cooperation, and noted that the Town of Greece Managers' Handbook was revised to explicitly provide Bill Reilich with discretionary control over this benefit"; and (2) "The Amended Complaint plainly alleges that Keith Suhr, or in the alternative, Bill Reilich, was the final policymaker with respect to employee benefits and wrongfully denied [Plaintiff] retiree health insurance coverage." (Dkt. 19 at 22-23 (internal quotations omitted)).  In their reply, Defendants address the first of these arguments, but not the second.  (*See* Dkt. 20 at 10-11).

 "A municipality may . . . be liable for even a single unconstitutional act of an official who has final policy-making authority." *Taylor v. City of New York (Dep't of Sanitation)*, No. 17 CV 1424-LTS-SDA, 2019 WL 3936980, at *5 (S.D.N.Y. Aug. 20, 2019).  "If an official's decision was, at the time it was made, for practical or legal reasons the municipality's final decision, then they are a final policymaker." *Id*. (alterations and quotation omitted).  At the pleading stage, a plaintiff must allege sufficient facts to support a fair inference for such a conclusion.  *Id*.

Plaintiff has alleged sufficient facts to support a fair inference that Reilich's decision was the Town's final decision on whether he would be permitted to enroll in lifetime retiree health insurance. Reilich was the Town Supervisor, and Plaintiff expressly alleges that he had authority over this determination. *See id*. ("Other factors which are significant to determining whether an individual's authority rises to a policymaking level include the individual's scope of employment and their role within the organization."). Defendants do not address these allegations in their moving papers, and have failed to demonstrate that dismissal of the § 1983 claim against the Town is warranted.

### E.   TVPA Claim

Finally, Defendants seek dismissal of Plaintiff's TVPA claim (the seventeenth claim), which is asserted against Reilich and Marini. (*See* Dkt. 17-2 at 24-27). The Court has determined, for the reasons discussed in connection with Plaintiff's RICO claims, that Plaintiff has not plausibly alleged a violation of the TVPA. The Court grants this aspect of Defendants' motion.

## III.   Request to Stay Discovery

The Court notes that Defendants moved to stay discovery during the pendency of their motion to dismiss. (Dkt. 17-2 at 28-29). In light of the Court's resolution of the motion to dismiss, this request is denied as moot.

## CONCLUSION

For these reasons, Defendants' motion to dismiss (Dkt. 17) is granted as to the RICO claims (the first and second claims) and the TVPA claim (the seventeenth claim)

and is denied in all other respects.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:        September 3, 2024
              Rochester, New York